IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

COLUMBIA GAS TRANSMISSION LLC,

          Plaintiff,

v.                                         CIVIL ACTION NO.   3:14-11854

UNITED STATES OF AMERICA
and TRI-STATE AIRPORT AUTHORITY,

          Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending is Defendant United States of America's ("United States") Motion for Summary Judgment. ECF No. 163. In this case, Plaintiff Columbia Gas ("Columbia Gas") alleges the United States and Defendant Tri-State Airport Authority ("the Airport") by their negligent acts caused a landslide that damaged Columbia Gas's natural gas pipeline and required emergency remediation by Columbia Gas. Columbia Gas asserts claims against both the United States and the Airport; the claims against the United States are brought under the Federal Tort Claims Act ("FTCA") for negligence, trespass, and nuisance. The United States asks for summary judgment on these claims because, it contends, (1) the FTCA's discretionary function exception applies; (2) the FTCA's independent contractor exception applies; (3) no federal employee committed any of the complained of negligent acts; and (4) even if federal employees were negligent as alleged, Columbia Gas has failed to demonstrate the causation element of the negligence claim against the United States. As explained below, the Court finds the independent contractor exception applies in this case, and for that reason it does not address any other ground for summary judgment in the United States' favor. Therefore, the Court DENIES the United States' Motion for Summary

Judgment but DISMISSES the claims against the United States for lack of jurisdiction under the FTCA. *Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995) ("[i]f [independent contractor exception applies] . . . , the United States has not waived its sovereign immunity[, and] the case should be dismissed for want of jurisdiction under Rule 12(b)(1)").

## I. Background

According to the Complaint and evidence adduced to-date, Columbia Gas sells natural gas, which it transports via underground high-pressure pipelines to its customers. Compl. ¶ 12, ECF No. 1. One of Columbia Gas' underground gas pipelines, BM-74, is located on a right of way (an "easement") on property owned by the Airport in Wayne County, West Virginia and leased to the West Virginia State Armory Board for the Tri-State Armed Forces Reserve Center (the "Armory"), which is used by both the United States Army Reserve and the West Virginia Army National Guard ("WVANG"). Compl. ¶¶13–14; Airport's Answ. ¶ 14, ECF No. 6. In 2012, a landslide occurred on the Airport's property leased to the West Virginia State Armory Board, which in turn displaced a section of Columbia's BM-74 high-pressure natural gas transmission pipeline.

### A. The 2012 Landslide and its Cause

On March 9, 2012, a Columbia Gas employee was inspecting the BM-74 pipeline and discovered that a 400 foot landslide had formed above Columbia Gas' pipeline. Compl. ¶ 18; Dep. of Timothy Sweeney, at 21–22, 27 (Nov. 10, 2015) [hereinafter "Sweeney Dep."]. As the slide progressed over the next several days, the sliding soil displaced the pipeline approximately 18 feet from its original position, causing the pipeline to buckle. Compl. ¶ 18; Dep. of Steve Bellini, at 79 (Sept. 1, 2015) [hereinafter "Bellini Dep."]. This required Columbia Gas to take the pipeline out of service and to remediate the area by excavating, stabilizing, and reconstructing the failed slope. Compl. ¶ 19; Bellini Dep. at 17. Approximately 50,000 cubic yards of organic material was

removed and replaced, and 200 feet of pipeline was replaced, costing approximately $1,116,915.00 for the whole remediation effort. Compl. ¶ 19.

Columbia Gas maintains the 2012 landslide was caused by two negligent acts: the Airport's improper placement of end-dump fill on the slope above Columbia Gas's easement and the United States' approval of a negligently constructed drainage system at the Armory.[1] As for the negligently constructed drainage system, Columbia Gas claims contractors constructed the Armory's drainage system not in accordance with its design. Pl.'s Resp. to U.S.'s Mot. for Sum. J. at 6, ECF No. 168. As constructed, the drainage system collected and diverted large amounts of surface water directly onto the end-dump filled slope. Supplemental Report of Cardno, Inc., at 14–16 (June 30, 2015) [hereinafter "Cardno Supp. Report"]. At least three construction variations from the Armory's design diverted water onto the slope. *Id.* First, the channel constructed to direct

---

[1] Columbia Gas claims the Airport's decision to place end-dump fill above its easement containing a natural gas pipeline was negligent. As a result of end-dump filling, organic material—which included tree trunks, stumps, telephone poles, tires, and other deleterious materials—was placed in the slope during construction projects dating back to the 1950s and 1970s, and this organic material in turn compromised the slope's stability. Compl. ¶ 20; Initial Report of Cardno, Inc., at 4 (Nov. 17, 2014) [hereinafter "Cardno Initial Report"]; Dep. of Bruce Allan Reynolds, at 23, 38 (Nov. 11, 2015) [hereinafter "Reynolds Dep."]; Dep. of W. Dale Nicholson at 116 (Sept. 10, 2015) [hereinafter "Nicholson Dep."]. According to the Airport's expert, John Weaver:

> End dumping of fill materials is a common practice on earthmoving projects of discarding unsuitable, structural deleterious, or excess soil and rock due to its low cost . . . Nothing is inherently wrong with this practice. It is a trade-off of lessening current construction costs while possibly limiting the future use at the fill site . . . additional measures will need to be taken to make these types of fills suitable for future development.

Superseding Expert Report of John Weaver at 12–13 (Jan. 30, 2015) [hereinafter "Weaver Superseding Report"]. According to Columbia, although the end-dump fill was constructed properly, it was improper for the Airport to place end-dump fill on a slope above Columbia Gas's easement containing a natural gas pipeline and then to permit development of the Armory using part of that slope.

runoff from the Armory (the "rip rap channel") had not been properly constructed or lined, allowing surface water collected from the mountaintop to soak into the slope, instead of guiding that water to the drainage reservoir situated below Columbia Gas's pipeline. *Id.* at 14; Compl. ¶21. Second, the drainage system emptied directly onto the slope rather than emptying into the established storm drainage system or a dedicated drainage channel. Cardno Supp. Report, at 15; Compl. ¶ 21. Third, the swales were improperly constructed such that they diverted significantly less surface water from the slope. *See* Cardno Supp. Report, at 16; Report of E.L. Robinson Engineering, at 3 (Dec. 1, 2014). As a result, the slope's soil was saturated with water that otherwise would not have collected on the filled slope. *See* Nicholson Dep. at 140.

### B. The Armory

The Armory was constructed in 1994. Dep. of Col. David P. Shafer, at 24, 29 (Sept. 2, 2015) [hereinafter "Shafer Dep."]. Before the Armory was built, the State of West Virginia contracted with Gandee and Partners, an Architect and Engineering firm ("A&E Firm"), to design the Armory. *See* Contract for Architect-Engineer Services (Apr. 19, 1993), ECF No. 163–4. This design contract was between the State of West Virginia and the A&E firm, as evidenced by the signatures of Gaston Caperton, then-governor of West Virginia, and a representative of the A&E firm. *Id.* In September 1994, the State of West Virginia awarded the construction contract to Neighborgall Construction Company ("construction firm"). *See* Army Nat. Guard Construction Contract (Sept. 19, 1994), ECF No. 163–5. The construction contract was between the State of West Virginia and the construction firm, and it explicitly stated "[t]he Federal Government is not a party to this contract. *Id.* at WVANG007320.

### C. Procedural Posture of this Case

On March 7, 2014, Columbia Gas filed a Complaint against the United States, the Airport, and State Defendants—the West Virginia Army National Guard, the West Virginia State Armory Board, the Adjutant General of West Virginia ("TAG"). Compl., ECF No. 1. Columbia Gas sued the United States under the FTCA. *Id.* In July 2015, the Court dismissed the State Defendants because they were entitled to Eleventh Amendment immunity. *Columbia Gas Transmission, LLC v. United States*, No 14-11854, 2015 WL 4276334, at *1 (S.D.W. Va. July 14, 2015).

Subsequently, the United States moved for summary judgment in its favor, contending: (1) Columbia Gas's claims under the FTCA are barred by that Act's discretionary function exception to liability; (2) the FTCA's independent contractor exception applies to preclude the United States' liability; (3) no federal employee committed any of the complained of negligent acts; and (4) even if federal employees were negligent as alleged, Columbia Gas has failed to demonstrate the United States caused the landslide that damaged Columbia Gas's pipeline, entitling the United States to summary judgment on the negligence claim. United States Mot. for Sum. J. 1–2, ECF No. 163.

Having summarized the evidence adduced to date, the Court will detail the standard of review for summary judgment and then discuss the United States' motion.

### II. Legal Standard

To obtain summary judgment, the moving party must show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475

U.S. 574, 587-88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Satisfying the burden of proof requires more than a mere "scintilla of evidence." *Anderson*, 477 U.S. at 252.

### III. Discussion

As a sovereign, the United States is immune from all suits against it absent an express waiver of its immunity. *Welch v. United States*, 409 F.3d 646, 650 (4th Cir. 2005). In the FTCA the United States has explicitly waived sovereign immunity by making the federal government liable in tort "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. This waiver is tempered, however, by a number of exceptions. *See* 28 U.S.C. § 2680. Because the Court finds the FTCA's independent contractor exception applies in this case, it will discuss only the United States' argument regarding that exception.

#### A. Independent Contractor Exception

The United States argues the independent contractor exception applies to immunize the United States from liability in this case. Specifically, the Government contends independent contractors employed by the State of West Virginia constructed the allegedly negligent drainage system without the sort of day-to-day supervision by federal employees necessary for the United States to be held liable for actions of independent contractors under the FTCA; because the United

States is not subject to suit for the tortious conduct of the State's independent contractors, this Court lacks subject matter jurisdiction over Columbia's claims against the United States. The Court agrees.

The acts of independent contractors are not acts of federal employees for which the United States is liable under the FTCA. 28 U.S.C. §§ 1346(b)(1), 2671; *Logue v. United States*, 412 U.S. 521, 525–527 (1973). Whether a person is a contractor or a federal employee for purposes of the independent contractor exception is determined under federal law. *Robb v. United States*, 80 F.3d 884, 887 (4th Cir. 1996) (citing *Logue*, 412 U.S. at 528; *Berkman v. United States*, 957 F.2d 108, 112 (4th Cir.1992)). Interpreting the FTCA, the Supreme Court has made clear that the United States will not be liable for negligent acts of independent contractors unless the United States supervised the "day-to-day operations" of the contractors. *Williams*, 50 F.3d at 306 (citing *Logue*, 412 U.S. at 529); *see also United States v. Orleans*, 425 U.S. 807, 815–16 (1976). "Stated differently, a court must consider whether the government exercises day-to-day control over the performance of the work under the contract." *Berkman*, 957 F.2d at 113 (citing *Wood v. Standard Products Co.*, 671 F.2d 825, 829 (4th Cir. 1982)). Establishing standards, supplying financial support, providing advice and oversight, inspecting and approving final work—all in order to ensure that federal funds are not used on unauthorized expenditures—will not give the federal government the "day-to-day control" over contractors necessary for the United States to be held liable for the contractors' actions. *See Orleans,* 425 U.S. at 818 (independent contractor exception applied because United States did not have power to supervise "daily operations" of contractor, even though United States did supply financial aid, advice, and oversight to assure federal funds were not diverted to unauthorized purposes); *Logue v. United States*, 412 U.S. 521, 530 (1973) (independent contractor exception applied because United States had no authority to physically

supervise contractor-jail's employees, although agreement did require United States to pay jail for its services and reserved a right for the United States to inspect the institution); *Berkman v. United States*, 957 F.2d 108, 114 (4th Cir. 1992) (independent contractor exception applied because United States did not have "physical control" over contractor's day-to-day operations, even though United States had right to inspect in order to ensure contractor's services were in compliance with contract). In determining the extent of control the United States exercises over contractors, courts should look to the contract between the United States and the contractor, if any exists. *Logue v. United States*, 412 U.S. 521, 529 (1973). The plaintiff bears the burden of showing a waiver of sovereign immunity and to show that none of the FTCA exceptions applies. *See Welch v. United States*, 409 F.3d 646 (4th Cir. 2005).

Viewing the evidence in a light most favorable to Plaintiff, the Court concludes that contractors hired by the State of West Virginia constructed the Armory's allegedly negligent drainage system without the day-to-day supervision of federal employees necessary for the United States to be held liable for the contractor's actions. Discovery has revealed the Armory was constructed pursuant to a contract between the State of West Virginia and independent contractors, and the United States was not a party to that contract. *See* Army Nat. Guard Construction Contract at WVANG007320. The WVANG monitored construction activities and progress; the A&E firm hired by the State designed the Armory and oversaw construction, among other things; the construction firm and its subcontractors actually constructed the Armory. *See* TAG's Resp. to Pl.'s First Set of Interrog. and Requests for Production of Documents at 2 and 9, ECF No. 163–12. If modifications were required during construction, the contractor submitted change orders to the State purchasing division for approval. *Id.* The State of West Virginia paid for the Armory's construction, and the federal government reimbursed the State of West Virginia pursuant to 10

U.S.C. § 18231, *et seq*. *See id.*; Maintenance Agreement between U.S. and W. Va., ECF No 168-10.

Although several federal employees participated in the construction process, no evidence indicates any federal employee exercised day-to-day control over the State contractors' construction work. Columbia Gas asserts that two federal employees—Colonel Southern and Major Walker—served as "project managers" and were the "ultimate authority on the project, overseeing the A&E Firm and construction company." *Pl.'s Memo. in Opp. to U.S. Mot for Sum. J.* at 16, ECF No. 168. However, none of the evidence adduced to-date indicates they exercised "physical control" over the contractors' day-to-day operations.[2] The deposition testimony of Colonel David Shafer indicates these two federal employees oversaw the State's contractors for the limited purpose of ensuring compliance with federal standards so the construction could be reimbursed by federal funds. *See* Shafer Dep., at 63–69 (explaining federal employees reviewed design submittals and had right to inspect Armory, and the review and inspections were to ensure

---

[2] Colonel Norm Southern's title during construction was construction and facilities management officer (CFMO). Shafer Dep., at 10–12, 74, 77–78. In this role, Colonel Southern was accountable to TAG for construction work completed. *Id.* at 73–74. Colonel Southern coordinated funding through the National Guard Bureau and made decisions in response to matters presented by the contractors. *Id.* During construction, Colonel Southern was replaced by Lieutenant Colonel Mel Burch. *Id.* at 11. There is no evidence that either Colonel Southern or Lieutenant Colonel Burch exercised physical control over the contractors' day-to-day construction work.

Major Rick Walker's title during construction was "project manager," but as the government points out, he did not exercise duties typically associated with a construction project manager. *Id.* at 10–11. The project manager role filled by Major Walker did not carry the duties of a construction superintendent, who organizes work flow of contractors. *Id.* Instead, Major Walker was the primary point of contact between the contractors and TAG; he answered questions, coordinated paperwork, and attended meetings on TAG's behalf. *Id.* at 11. No evidence adduced to-date indicates Major Walker exercised any physical control over the contractor's day-to-day construction work. Instead, an employee of the A&E Firm, Don Moses, was the person who filled the typical project manager role, directing the day-to-day work of the construction contractors. *Id.* at 75.

the Armory design and construction fell within the scope of what the federal government would reimburse.).

Based on Colonel Shafer's deposition testimony, the Court finds the sort of supervisory acts and decisions of these two federal employees were of the same sort that courts have previously held insufficient to constitute day-to-day control over contractors. For example, in *Perez v. United States*, 594 F.2d 280 (1st Cir. 1979), the First Circuit held the independent contractor exception immunized the United States from liability for a negligently constructed railing in a public housing property. *Perez*, 594 F.2d at 285. The railing was constructed by a municipal housing authority, a contractor of the United States. *Id.* at 283. The court found the contractor, not the United States, was "fully responsible for the design and construction of the project," even though the United States provided funds contingent upon specifications being met; it had a right to inspect the project and review all work completed; and a government inspector may have been on the construction site "all the time." *Id.* at 285–86. The court observed the inspector's function at the construction site was to "protect the [United States'] financial interests"; he was not responsible for supervising the architects or construction crews, nor for the plans—which were drafted by the contractor and approved by the United States. *Id.* at 286. In the end, the court concluded the United States' control over construction was that of a "financier with particular goals," and the contractor was fully responsible for the construction of the project. *Id.* at 285. Looking back to the present case, even if the "buck stop[ped] at the United States," *Pl.'s Resp.* at 16, the United States' inspection and approval of construction for purposes of federal reimbursement does not, in the absence of physical control by the United States over the State contractors' daily work, make the United States liable for the negligent construction completed by the those contractors. *Orleans,* 425 U.S. at 818; *Logue,* 412 U.S. at 530; *Williams*, 50 F.3d at 306; *Berkman*, 957 F.2d at 114.

Finding the United States lacked physical control over the State contractors' daily work, the Court concludes the independent contractor exception applies to immunize the United States from any alleged liability in this case. More specifically, the United States cannot be held liable for the allegedly negligently constructed drainage system completed by West Virginia's contractors. Because the independent contractor exception applies to Columbia Gas's claims against the United States, these claims must be dismissed for lack of jurisdiction.

### IV. Conclusion

As explained above, the Court finds the independent contractor exception applies to each of Columbia Gas's claims against the United States. Because the independent contractor exception applies, the United States is immune from suit, and the Court lacks jurisdiction to enter judgment on Columbia's claims against the United States. Therefore, the Court **DENIES** the United States' Motion for Summary Judgment and **DISMISSES** the action against the United States for lack of jurisdiction.

The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER: February 4, 2016

_____
ROBERT C. CHAMBERS, CHIEF JUDGE