IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

COLUMBIA GAS TRANSMISSION LLC,

          Plaintiff,

v.                                                              CIVIL ACTION NO.   3:14-11854

UNITED STATES OF AMERICA
and TRI-STATE AIRPORT AUTHORITY,

          Defendants.

**MEMORANDUM OPINION AND ORDER**

At a pretrial conference held on February 2, 2016, the Court addressed motions in limine brought by Plaintiff Columbia Gas ("Columbia Gas"), ECF Nos. 183, 184, and Defendant Tri-State Airport Authority (the "Airport"), ECF Nos. 189, 190. Columbia Gas asked to exclude evidence relating to telephone poles as a cause of the slope failure, ECF No. 183, and evidence suggesting Columbia Gas's 1988 pipeline relocation contributed to the slope failure, ECF No. 184. The Airport sought exclusion of evidence regarding Columbia Gas's damages for loss of use, ECF No. 189, and certain communications by the Airport's employees subsequent to the slope failure, ECF No. 190. The Airport also asked to exclude certain opinions of Columbia Gas' expert Dale Nicholson. ECF No. 160. For the reasons and to the extent explained below, the Court GRANTED Columbia Gas's motions regarding telephone poles and the 1988 pipeline relocation, DENIED as moot the Airport's motion regarding loss of use damages, GRANTED the Airport's motion to exclude certain communications by Airport employees, and DENIED the Airport's motion to exclude expert opinions of Nicholson.

        **I.**        **Plaintiff's Motion to Exclude Telephone Pole Evidence**

In its motion in limine and at the pretrial conference, Columbia Gas argues that evidence relating to the party responsible for placing telephone poles into the slope should be excluded pursuant to Federal Rules of Evidence 401, 403, and 702 because such evidence is irrelevant, unreliable, misleading, and inconsequential. The Airport offers only two pieces of evidence in support of an inference that another party—specifically Columbia Gas's predecessor—placed the telephone poles in the slope: (1) a 1957 contract requiring Columbia Gas's predecessor to remove telephone poles near the pipeline and (2) testimony to be elicited from Columbia Gas's expert that Columbia Gas's current standard practice is to remove and dispose of telephone poles located over a pipeline easement that is being relocated. The Airport argues this evidence is admissible to rebut the conclusion of Columbia Gas's expert that the Airport was responsible for placing the telephones into the slope. The Airport also contends this evidence is admissible to prove Columbia Gas had prior knowledge that the slope was filled with organic materials when Columbia relocated its pipeline in 1988.

Only relevant evidence is admissible. Fed. R. Evid. 402. Evidence is relevant if it has any tendency to make a fact of consequence more or less probable than it would be without the evidence. Fed. R. Evid. 401. The Advisory Committee Notes provide further guidance, stating:

> Relevancy is not an inherent characteristic of any item of evidence but exists only as a relation between an item of evidence and a matter properly provable in the case. Does the item of evidence tend to prove the matter sought to be proved? Whether the relationship exists depends upon principles evolved by experience or science, applied logically to the situation at hand.

Fed. R. Evid. 401, advisory committee note on proposed rule.

At the pretrial conference, the Court found that neither the entity who placed telephone poles into the fill nor the contribution of those poles to the slope failure were facts of consequence

under Rule 401(b), and therefore evidence is not admissible to prove these facts.[1] However, the Court also concluded the Airport may offer evidence to support an inference that Columbia Gas was aware the telephone poles were placed in the slope sometime around 1957, and therefore Columbia Gas knew the slope was constructed with end-dump fill when it relocated its pipeline in 1988.

Applying Rule 401, the 1957 contract and expert testimony are admissible to prove Columbia Gas knew the slope was composed of end-dump fill when it relocated its pipeline in

---

[1] Even if a party other than the Airport placed the telephone poles into the fill, this is not a fact of consequence in determining the action, as required under 401(b). If Columbia Gas's predecessor placed the poles into the slope, it could only have done so with the Airport's permission because the evidence indicates that in 1957 the slope was owned and possessed by the Airport. Neither party has adduced evidence that a third party dumped the poles into the slope without the Airport's knowledge or consent. In Weaver's supplemental report he admits "[t]he airport appears to have been a very passive landowner in this regard, in the subject area of the landslide." Weaver Supplemental Report at 3, ECF No. 158-5. Additionally, regardless of who placed the telephone poles into the slope, per the Restatement (Third) of Property (Servitudes) § 1.2(1), the Airport is responsible for the artificial conditions on its land that interfered with Columbia Gas's use of its easement. *See* Restatement (Third) of Property (Servitudes) § 1.2(1), cmt d ("The transferor of an easement . . . retains the right to make all uses of the land that do not unreasonably interfere with exercise of the rights granted by the servitude. For example, the transferor of an easement for an underground pipeline retains the right to enter and make any use of the area covered by the easement that . . . does not unreasonably interfere with use of the easement for pipeline purposes."). End dumping fill onto a slope near the easement and then permitting development of that slope into a drainage field, which in turn culminated into failure of the slope and damage to Columbia Gas's pipeline, constitutes an unreasonable interference with Columbia Gas's use for pipeline purposes. Thus, the entity that placed the telephone poles into the slope is not a fact of consequence in determining the action, as required by Rule 401(b). Because 401(b) is unmet, evidence offered to prove the entity who placed the poles into the hill is excluded from this action.

Additionally, any contribution the telephone poles made to the slope's failure is not a fact of consequence in determining this action. Evidence suggests that during the 2012 remediation only two telephone poles were found within roughly 50,000 cubic yards of organic material that composed the fill. Based on this, the Court finds that any effect the poles may have had on the slope's stability is so trivial that, as a matter of law, a jury could not conclude that placing the poles into the slope factually caused the slope's failure, e.g., a jury could not reasonably conclude the slope would not have failed but for placing the poles into the fill. Therefore, the poles' contribution to the slope failure is not a fact of consequence in determining this action.

1988.[2] The 1957 contract and expert testimony have a tendency to make it more or less probable that Columbia Gas placed the telephones in the fill sometime around 1957, and therefore, Columbia Gas knew the slope was constructed with end-dump fill when it relocated its pipeline closer to the slope in 1988. Columbia Gas's knowledge in 1988 that the slope consisted of end-dump fill is a fact of consequence because it goes to Columbia Gas's potential comparative fault for the damage to Columbia Gas's pipeline in 2012.[3]

## II. Plaintiff's Motion to Exclude 1988 Pipeline Relocation Evidence

Next, Columbia Gas asks to exclude evidence suggesting its 1988 pipeline relocation contributed to the 2012 slope failure; Columbia Gas claims such evidence is speculative and for that reason fails to satisfy 702's standards for expert opinions. The Airport and the United States offer the expert opinions of John Weaver (the Airport's expert) and Christopher Grose (United States' expert) to rebut testimony of Columbia Gas's expert, Dale Nicholson. Specifically, Defendants would like to rebut Nicholson's opinion that (1) the relocation did not cause the 2012 slope failure and (2) the relocation actually *stabilized* the slope. Columbia Gas does not attack the

---

[2] The Court finds Rules 403 and 702 are not obstacles to the admissibility of this evidence. The probative value of the 1957 contract and expert testimony supporting an inference about Columbia Gas's knowledge of the slope's composition is not substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. The contract and testimony are the only evidence offered to prove Columbia Gas's potential comparative fault for damage to the pipeline in 2012; and as much as Columbia Gas's comparative fault may be prejudicial to Columbia Gas's case, the Airport is entitled to use admissible evidence to prove such fault. Furthermore, expert testimony supporting an inference that Columbia Gas had knowledge in 1988 that the slope consisted of end-dump fill is admissible under 702 because it is both relevant and reliable. The relevance is explained later in the text of this Opinion. And the testimony is reliable because it is based on reviewing the 1957 contract, topographical maps and aerial photographs, on-site inspections, depositions of Columbia Gas's representatives and experts, and reports prepared by Columbia Gas's experts.

[3] According to Defendants, the comparative fault argument goes something like this: a reasonably prudent gas company would not relocate a high-pressure gas pipeline closer to a slope susceptible to a land slide; and so, Columbia Gas's relocation of the pipeline in 1988 closer to, as opposed to away from, the slope was negligent.

qualifications of either Weaver or Grose, only the admissibility of an opinion they might offer that the 1988 pipeline relocation contributed to the 2012 slope failure. In the following paragraphs, the Court will explain its decisions, and the reasoning underlying them, on admissibility of expert testimony regarding the 1988 pipeline relocation as a cause of the 2012 slope failure.[4]

During the pretrial conference, the Court granted Columbia Gas's motion to exclude expert opinions that the 1988 pipeline relocation contributed to the slope failure. Such opinions are not necessary for rebuttal because Columbia Gas's expert will refrain from opining that the 1988 relocation did *not* contribute to the slope failure, nor will he testify that the relocation stabilized the slope. Additionally, as explained below, an opinion that the 1988 pipeline relocation contributed to the slope failure is not an admissible expert opinion under Rule 702. However, expert testimony that a disturbance at the toe of a slope could contribute to slope failure is admissible under 702. This expert opinion will help the trier of fact determine for itself whether Columbia Gas's 1988 pipeline relocation contributed to the slope's 2012 failure. In the following paragraphs, the Court will explain its decisions applying Rule 702 to (1) exclude evidence that the 1988 pipeline relocation contributed to the 2012 slope failure, and (2) admit an opinion that a disturbance at the toe of a slope could contribute to slope failure.

Expert opinions from Weaver and Grose that the 1988 pipeline relocation contributed to the slope's failure are inadmissible under 702 because these opinions are not based on sufficient

---

[4] Although the Parties argue over whether West Virginia law may supply the standard for admissibility of expert testimony in this case, Federal Rule of Civil Procedure 702 is the only standard for determining admissibility of the expert opinions here. Under Rule 702, an expert witness may provide an opinion on a matter if: (a) it will help the trier of fact understand the evidence or determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principle and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702. In the end, expert testimony must be both relevant and reliable, and the trial judge acts as a gatekeeper who keeps out unreliable expert opinions. Fed. R. Evid. 702, advisory committee note to 2000 amendment.

facts. By their own admission, neither expert was able to opine that Columbia's 1988 pipe relocation destabilized the slope or contributed to its failure in 2012. In Weaver's deposition, Weaver himself testified "no" when asked if he could say to a reasonable degree of scientific certainty that what Columbia Gas did in 1988 had "something to do with the failure, in a causative fashion, of th[e] slope." Dep. of John Weaver, at 75 (Nov. 9, 2015), ECF No. 199–4 [hereinafter "Weaver Dep."]. When he was asked "[w]ell, I think we already determined that you can't say . . . to a reasonable degree of certainty that the pipeline work in 1988 had anything to do with slope failure," Weaver responded "[a]bsolutely. But [Mr. Nicholson] said it didn't, and . . . all I'm saying is you can't say that. I'm not saying it did, but you can't say it didn't." Weaver Dep. at 122–23. Although Weaver also responded yes when he was asked "[c]an you say that the 1988 . . . relocation . . . , to a reasonable degree of scientific certainty, had anything to do with the slide occurring?" he soon after clarified his opinion: "I'm saying when you're digging at the bottom of a very steep slope, that can have negative consequences to the stability of the slope. So there's that potential." Weaver Dep. at 74. Thus, Weaver's opinion expressed during his deposition is not that Columbia Gas' 1988 pipeline relocation caused the 2012 slope failure. Indeed, he admitted he did not have a sufficient factual basis for that conclusion. However, he has offered the opinion that a disturbance at the bottom of a slope could contribute to that slope's failure, a more general proposition than the one Columbia Gas seeks to exclude. Because Weaver admitted he did not have a sufficient factual basis to conclude Columbia Gas' 1988 pipeline work contributed to the slope's failure, he is not permitted to offer an opinion to that effect at trial.

Nor did Grose conclude, based on the facts of this case, that Columbia Gas' work caused the slope's destabilization and eventual failure. During Grose's deposition, when Grose was asked whether he knew what work Columbia performed in its facilities upgrade, Grose replied "no."

Dep. of Christopher Grose, at 62 (Nov. 9, 2015), ECF No. 199–1 [hereinafter "Grose Dep."]. When discussing if saturation into a ground sag caused by the pipeline contributed to the slope failure, Grose was asked if it was a fair statement that the sag was not caused by any work or error that Columbia made when it upgraded its pipeline. To this Grose responded "that's a fair statement." Grose Depo. at 67. Thus, Grose admitted that saturation resulting from the sag was not caused by Columbia Gas's 1988 pipeline relocation, and in turn, to the extent the slope failure was due to water saturation, this was not due to the 1988 pipeline relocation either. One might still contend that Grose could nonetheless have concluded that Columbia Gas' disturbing the soil at the bottom of the slope in 1988 is a possible cause of the 2012 landslide. However, Grose, neither in his report nor during his deposition, specifically opined that Columbia Gas' 1988 pipeline relocation caused the 2012 landslide.[5] And because the Court is unable to find sufficient facts to support such an

---

[5] Grose came close to concluding this but fell short when he wrote:

> The proximity of the . . . pipeline to the toe of the fill slope along with the disturbance to the area [during relocation projects] likely also contributed to the weaken[ed] condition of the slope and its ultimate failure.

Def. Tri-State Airport Authority's Mot. for Summ. J, Ex. J Part 1, at 9–10 (Jan. 3, 2015), ECF No. 158–12 [hereinafter "Potesta Report"]. Considering Grose's use of the term "likely" and the generic explanation leading up to this statement, the Court finds this conclusion is not admissible under Rule 702 because it is not sufficiently based on facts specific to the slope failure in this case. In the sentences preceding Grose's conclusion that the relocation projects *likely* contributed to the weakened slope and its failure, Grose provided no analysis specific to this case about the slope's conditions. Instead, Grose simply explained the basic concept of toe failure while inserting into that explanation facts relevant to this case. *See id.* ("The ground disturbance near the toe of the slope . . . also contributed to weaker soil conditions. These weakened soils provide support to the fill areas upslope. It is common for seepage and shallow infiltration to collect and buildup along backfilled pipeline trenches. This collected subsurface water contributes to the saturation of these naturally occurring soils which in this case were situated below and providing support to the fill slope. The initial failure of these toe soils along the pipeline right-of-way would have resulted in regressive and continued failure of the entire fill slope due to the initial lack of toe support along the pipeline right-of-way."). Notably, Grose did not point to any on-site observations to support this conclusion, although Potesta did make extensive on-site observations. Because of this, the

opinion, Grose is not permitted to offer at trial an opinion that Columbia's 1988 pipeline work contributed to the slope's failure.

However, the Court will admit under Rule 702 expert testimony from Weaver and Grose that a disturbance at the bottom of a slope could contribute to slope failure. Based on the experience of these experts and the evidence they reviewed, this expert opinion is reliable and therefore will help the trier of fact determine whether Columbia Gas's 1988 pipeline relocation contributed to the slope's 2012 failure, a fact pertaining to Columbia Gas's comparative fault in this case. Unlike the opinion on the ultimate issue of whether Columbia Gas's 1988 pipeline relocation caused the slope failure, this more general opinion is supported by fact. Weaver, in his supplemental report dated November 2, 2015, criticized the expert opinion of Columbia Gas, Nicholson, who said that the 1988 relocation stabilized the slope. Weaver said, "[t]his hypothesis fails to understand the nature of slope failure." Weaver Supplemental Report at 4–5. To support this critique, Weaver offered an opinion explaining how slopes may fail due to destabilization at the slope's base.[6]

---

Court concludes Grose was not drawing a conclusion from any facts or observations specific to this case. Therefore, Grose's conclusion in the Potesta Report—that the disturbance at the bottom of the slope likely contributed to the weakened condition of the slope and its ultimate failure—is not sufficiently based on facts to merit its admissibility under Rule 702.

[6] Weaver explained:

> A "toe failure" is a common failure mechanism. In that instance, there is a weak area and/or maximum stress at the toe of the slope. For instance, a trench could be dug along the toe of the slope, reducing the forces stabilizing the slope. The slope begins to fail at the toe, as this is the weakest area. As those soils fail and move, they remove the stabilizing force from the soils overlying them, and the failure progresses up the slope, and laterally as well. Thus, even though the failure started at a weak point at the toe, the slope, after failure, extends up the slope and soft disturbed saturated soils can be seen in the overlying soils.

Weaver Supplemental Report at 5.

Grose, in Potesta's report, also discussed the general concept of slope failure resulting from destabilization at the slope's base.[7]

To conclude, the Court GRANTS Plaintiff's motion to exclude expert opinions that the 1988 pipeline relocation contributed to the slope's 2012 failure. Such opinions are inadmissible under Rule 702 because they are not based on sufficient facts. However, the Court will admit under Rule 702 expert opinions from Weaver and Grose that a disturbance at the bottom of a slope could contribute to slope failure; such testimony is relevant and reliable enough to assist the trier of fact in determining the issue of Columbia Gas's comparative negligence.

### III. Defendant's Motion to Exclude Loss of Use Evidence

During the pretrial conference, Columbia Gas's counsel informed the Court that it would not seek damages for loss of use or lost profits stemming from the pipeline's inability to transport gas during the remediation effort. Therefore, the Court DENIES as moot the Airport's motion to exclude evidence regarding loss of use damages.

### IV. Defendant's Motion to Exclude Communications by Airport Employees

---

[7] Grose explained:

> The ground disturbance near the toe of the slope as a result of the two pipeline relocation projects[, in 1957 and 1988,] also contributed to weaker soil conditions. These weakened soils provide support to the fill areas upslope. It is common for seepage and shallow infiltration to collect and buildup along backfilled pipeline trenches. This collected subsurface water contributes to the saturation of these naturally occurring soils which in this case were situated below and providing support to the fill slope. The initial failure of these toe soils along the pipeline right-of-way would have resulted in regressive and continued failure of the entire fill slope due to the initial lack of toe support along the pipeline right-of-way.

Potesta Report, at 9–10; *see also id.* at 11, ¶ 7.

The Airport argues certain communications by Airport employees—ones Columbia Gas has indicated it intends to use at trial—are irrelevant under 401. In the alternative, the Airport argues their admission into evidence would be overly prejudicial under 403. In its motion, the Airport listed ten specific letters and e-mail chains it seeks to exclude from trial, all of which are attached to the Airport's motion as Exhibit B. Airport's Mot. in Limine to Exclude Statements, Ex. B, ECF No. 190–2. In response, Columbia Gas asserts these communications are relevant to prove the Airport admitted liability for the slope failure and that it owed Columbia Gas a duty.

At the pretrial conference, the Court granted under Rule 401 the Airport's motion to exclude the communications by Airport employees. After reviewing each letter and e-mail, the Court found these communications are not relevant to prove any admission by the Airport as to its liability or duty to Columbia. The Court will briefly explain its reason for rejecting Columbia Gas's theory that these communications are relevant under Rule 401.

Of the ten Airport employee communications Columbia Gas asked to admit into evidence, Columbia Gas addressed only three categories specifically in its brief responding to the Airport's motion to exclude such statements: (1) statements by the Airport's director seeking federal emergency relief funds, (2) statements showing the Airport's involvement with and approval of Columbia Gas' remediation efforts, and (3) statements showing the Airport understood Columbia Gas was not responsible for the 2012 slope failure and financial costs of slope remediation. *See* Pl.'s Resp. 2–3, ECF No. 196. However, none of these statements, nor any of the others the Airport seeks to exclude, constitute an admission by the Airport that it is liable for the slope failure or that it owed a duty to Columbia Gas.

As for the first category of statements, Columbia Gas first points to a letter from Airport Director Jerry Brienza to Congressman Nick Rahall in which Brienza sought federal emergency relief, saying:

> It is my understanding that Columbia Gas is requesting from the WV National Guard $750,000 to help pay for the cost of said repairs. The property that was affected is owned by the Tri-State Airport Authority and leased to the WV National Guard. The Guard is requesting our assistance, as the property owners, to help secure this funding should they be responsible to pay.
>
> Is it too late to apply for Emergency Funding Assistance through FEMA or any other emergency operations centers? Is there any funding or assistance available through any of our other military service units . . . or within the States that you know of?

Letter from Jerry Brienza, Tri-State Airport Authority, to Congressman Nick Rahall (Aug. 17, 2012), ECF No. 109–2. The Court finds this statement is not an admission by the Airport that it was liable for the slope failure or remediation, nor is it an admission that the Airport owed a duty to Columbia. The statement indicates only that the Airport sought federal emergency relief funds on behalf of the WVANG, which is not an admission of liability or duty owed. Furthermore, the statement cannot support an inference that the airport admitted liability or duty by its requesting emergency relief because such an inference is unreasonable in light of the danger posed to the Airport by a nearby buckled, i.e., broken, high-pressure natural gas pipeline. Nor does the statement by Robert Fuller, a consultant to WVANG, constitute an admission of Columbia's liability or duty owed because Fuller was not an employee of the Airport. Transcript of voicemail from Robert Fuller, Capital Engineering, to Steve Bellini, Columbia Gas, TSCO000001035, ECF No. 109–2. As such, these statements are not relevant to show the Airport's admission of liability or duty owed.

Turning to the second category of statements, Columbia Gas points to two e-mail chains which evidence the Airport's involvement with and approval of remediation efforts. As an initial

matter, the Airport's actions are akin to subsequent remedial measures, even if not exactly that, and they nonetheless fall within the policy for excluding such evidence under Rule 407. *See* Fed. R. Evid. 407, advisory committee note on proposed rule ("[t]he conduct is not in fact an admission, since the conduct is equally consistent with injury by mere accident or through contributory negligence"). Turning to the statements themselves, the first e-mail chain is between contractors hired by Columbia Gas to remediate, Bruce Reynolds and Leonard "Butch" McCoy. E-mail from Bruce Reynolds to Leonard McCory (Mar. 15, 2012), TSCO000001040, ECF No. 190–2. In the e-mail, Reynolds tells McCoy they have a meeting with the Airport's Director of Operations, Bob Maynard, at the "slip site," and "it appears this whole matter will be resolved to everyone's satisfaction." *Id.* The second e-mail is from Reynolds to Timothy Sweeney, another contractor hired by Columbia Gas for remediation. E-mail from Bruce Reynolds to Timothy Sweeney (Mar. 14, 2012), TSCO000001040, ECF No. 190–2. In that e-mail Reynolds tells Sweeney about a meeting with Maynard regarding work to be done on the Airport's property. *Id.* Reynolds says Maynard is "OK" with all the contractors must do, and his only request is that the contractors "repair all [they] tear up, seed and straw, etc." *Id.* These are not admissions by the Airport, not only because the e-mails are from Reynolds—who is not an Airport employee, but also because a mere meeting between the Airport and contractors about remediation work to be completed does not constitute an admission of liability or duty owed. Moreover, the meeting was necessary because the work was to involve Airport property other than Columbia Gas's easement. Thus, the contractors needed permission from the Airport to complete some of the work. This permission was not an admission. For these reasons, statements showing the Airport's involvement with and approval of remediation efforts are not relevant to prove the Airport admitted liability it had or a duty it owed.

The last category of statements are those showing the Airport understood Columbia Gas was not responsible for the 2012 slope failure or remediation. E-mail from Bruce Reynolds to Mike McFee, NiSource Gas Transmission and Storage (Mar. 14, 2012), TSCO000001051, ECF No. 190–2. In his e-mail, Reynolds told McFee that Airport Director of Operations Maynard understood "Columbia [Gas] is not obligated to repair this slip." *Id.* This is a statement by the Airport, but that statement cannot be construed as an admission of the Airport's liability or duty owed. The Airport's concession that Columbia Gas did not have an obligation to remediate is not an admission that the Airport was at fault for the slope failure or that the Airport was obligated to remediate that failure. The latter simply does not derive from the former. Therefore, the Airport's statements conceding Columbia Gas was not obligated to remediate the slope failure are not admissible to prove the Airport admitted liability or a duty owed.

To conclude, the Court granted under Rule 401 the Airport's motion to exclude certain communications by Airport employees. *See* Def.'s Mot. to Exclude Statements, Ex. B, ECF No. 190–2 (listing communications to be excluded). The communications may be admissible for impeachment purposes only; but if any party wishes to use these communications to impeach a witness, the party must first request a conference to explain the impeachment purpose outside the presence of the jury. Should any communication be admitted for impeachment, the Court will give the Jury an appropriate limiting instruction.

### V. Defendant's Motion to Exclude Expert Opinions of Nicholson

Lastly, the Airport argues certain opinions of Columbia Gas' expert Dale Nicholson are inadmissible under Rule 702. In his report, Nicholson concluded "the fill was constructed in the course of the airport expansion activities prior to the advent of the [WVANG] between April 1972, and April 6, 1975." Supplement Report of Cardno, at 20 (June 30, 2015) [hereinafter "Cardno

Supp. Report"], ECF No. 166–1. Nicholson also concluded that the Airport constructed the fill on the failed slope, as opposed to some other entity constructing the fill. *Id.* The Airport challenges the reliability of these opinions under Rule 702.[8]

To be admissible under Rule 702, expert opinions must be, among other things, based on principles and methods that are reliable, and those principles and methods must be reliably applied to the facts of the case. Fed. R. Evid. 702. The trial judge acts as a gatekeeper who keeps out unreliable expert opinions. Fed. R. Evid. 702, advisory committee note to 2000 amendment. The factors for assessing reliability of expert opinions explicated by the *Daubert* Court are (1) whether the expert's technique or theory can be or has been tested—that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

At the pretrial conference, the Court denied the Airport's motion to exclude Nicholson's opinions. The challenged opinions of Nicholson—that the fill was constructed during the 1950s and between 1972 and 1975, and that the Airport constructed the fill—are both reliable. They are the product of reliable principles and methods, and those principles and methods were reliably applied to the facts of this case. In its response, Columbia Gas outlined the principles and methods Nicholson used to arrive at these opinions. *See* Pl.'s Opposition to Defendant's Mot. to Exclude

---

[8] The Court rejects as inapplicable to Rule 702's analysis the Airport's arguments that Nicholson's opinions are inadmissible because other entities may have placed telephone poles in the fill, and they are inadmissible because Nicholson did not provide a standard of care.

Certain Opinions of Nicholson, at 4–5, ECF No. 166 [hereinafter "Pl.'s Resp."]. Nicholson narrowed the time periods for fill construction by reviewing topographical maps and aerial photographs provided by the Airport. *Id.* at 4.[9] The Court finds the map and photograph review method that Nicholson employed is, under these circumstances, a reliable method of determining when the fill was constructed. Next, Nicholson determined that the Airport constructed the fill on the slope by considering the construction activities that occurred during the time periods when the fill was placed. *Id.* at 5.[10] The Court finds that considering the construction projects during those time periods is, under these circumstances, a reliable method of determining what entity constructed the fill. Because the methods used to form Nicholson's two opinions are reliable, and those methods were reliably applied to the facts of this case, Nicholson's expert opinions are admissible at trial under Rule 702.

## VI. Conclusion

For the reasons and to the extent explained above, the Court **GRANTED** Columbia Gas's motions regarding telephone poles and the 1988 pipeline relocation, **DENIED** as moot the

---

[9] More specifically, according to Columbia Gas:

> A comparison of maps from 1950, 1957, and 1961 demonstrates that, during the 1950s, earth was removed from above the area where the slope would later be constructed, and pushed over the hillside. The slope remained unchanged for approximately twelve years, as demonstrated by a map from 1972. However, an aerial photograph taken in 1975 shows a rounded disturbed area on the hillside. The same area is shown in a 1994 map drawn prior to the construction of the Armory. From this evidence, Nicholson concludes that some fill occurred in the late 1950s, with the bulk occurring between 1972 and 1975.

Pl.'s Resp., at 4 (citations omitted).

[10] Between 1957 and 1959, the Airport "flattened the hilltop above the slope, where the Armory is now located," and in 1973, the Airport "removed four million cubic yards of earth to extend the airport's runway." Pl.'s Resp., at 5 (citations omitted).

Airport's motion regarding loss of use damages, **GRANTED** the Airport's motion to exclude certain communications by Airport employees, and **DENIED** the Airport's motion to exclude certain opinions of Plaintiff's expert Nicholson.

The Court **DIRECTS** the Clerk to send a copy of this written Memorandum Opinion and Order to counsel of record and any unrepresented parties.

ENTER: February 8, 2016

_____
ROBERT C. CHAMBERS, CHIEF JUDGE